**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS**

I, Andrew P. Lawton, being duly sworn, depose and swear as follows:

1. This affidavit is submitted in support of applications for search and seizure warrants in connection with the investigation of Keith CAMPBELL, Keisha JOHNSON, Lolita BURRUSS, Troy GRAY, Kevin MINOR, Ryan OWINGS, Tracy VENISON, Darrin CHASE, Eric RING, Brandon HALL, Julie and John KNOBLOCK, Anthony GRANT, Jerome MAPLES, Kenneth MINOR, Jerrod CLANTON, Thomas CHATMON and others relating to charges of violations of 21 U.S.C. §§ 841(a)(1), 846, and 843(b) and 18 U.S.C. § 1956; that is, offenses involving distribution and possession with intent to distribute controlled substances, including cocaine base (commonly known as "crack" cocaine), cocaine hydrochloride (HCL) and phencyclidine, (commonly known as "PCP"); conspiracy to distribute and possess with intent to distribute controlled substances including cocaine base, cocaine HCL and PCP; the use of a communications facility in furtherance of these crimes; and money laundering.

2. **Search warrants** are sought for the following locations:

A. **XXX XXXXXXXXXX Road, XXXX X, Rockville, Maryland**. This is further described as a garden style condominium sided in tan brick and siding with green shutters. The entry to this residence is located at the top of a stairway marked with the number "XXX" on a white placard above the entryway. The door to the residence marked with the letter "X". It is the residence of Keith CAMPBELL and Keisha JOHNSON.

B. **XXXXX XXXXXXX XXXX Drive, Olney, Maryland**. This is further described as a unit number XXXXX in a tan colored condominium-style building with wood trim. The residence is marked with the number "XXXXX" on a wooden pillar at the bottom of a flight of stairs and the door

for this residence is located on the left of the landing at the top of these stairs. It is the residence of Lolita BURRUSS.

C. **XXX XXXXXXX XXXXX, Frederick, Maryland**. This is further described as a red brick townhouse with black shutters. The residence has a grey satellite antenna on the roof and is marked with the number "XXX" on a white placard to the left of a white entry door. It is the residence of Troy GRAY and Teresa GRAY.

D. **XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland**. This is further described as a tan sided townhouse with white trim. This residence has a white decorative border surrounding the landscaping directly in front of the residence with the number "XXXX" in black lettering to the right of the door. It is the residence of Kevin MINOR.

E. **XXXX XXX XXXXXXXXX Avenue, XXXXX XXXXX, Hyattsville, Maryland**. This is further described as an office suite located in seven-story office building. XXXXX XXXXX is located on the fifth floor and the door to the suite is marked "XXXXX XXXXXXXXXXX XXXXXXXXXXX XXXX" It is commercial property leased and controlled by Kevin MINOR.

F. **XXXX XXXXXXXXXX XXXXXX, Baltimore, Maryland**. This is further described as a red brick row house with a white porch. The residence is marked with the number "XXXX" on a white placard to the left of a white entry door. It is the residence of Ryan OWINGS.

G. **XXXXX XXXXXXXX Road, Gaithersburg, Maryland**. This is further described as a red brick and light-colored sided single-family residence with an attached garage. The residence has the number "XXXXX" displayed over the front porch. It is the residence of Tracy VENISON.

H. **XXXX XXXXX Way, Brandywine, Maryland**. This is further described as a single-family residence sided in tan brick and siding with a fenced in backyard. The residence is marked with the number "XXXX" on a tan colored placard to the left of the front entry door. It is the residence of Darrin CHASE.

I. **XXXX XXXXXXXX XXXXX Drive, XX, Silver Spring, Maryland**. This is further described as duplex townhouse. XX is a red brick building with white trim displaying the number XXXX on a white placard above two blue doors located on XXXXXXXX XXXXX Drive.  XXXX XXXXXXXX XXXXX Drive, XX is the blue door on the left. It is marked with a white placard with XX to the left of this blue door. This is the residence of Akita Renee Lee and is located within the Barrington Apartments.

J. **XXX XXXXXXXXX Court, Frederick, Maryland**. This residence is further described as a white and red brick end unit townhouse with black shutters and

a fenced in backyard. This townhouse has the number "XXX" displayed on a white placard to left of a white entry door. It is the residence of Eric RING.

K. **XX XXXX XXXXXX Road, Gaithersburg, Maryland**. This residence is further described as a red brick townhouse with green shutters. The townhouse has the number "XX" displayed on a tan placard to the left of the entry door. It is the residence of Brandon O'Neil HALL.

L. **XXXXX XXXXXXX Avenue, Poolesville, Maryland**. This residence is further described as a light-colored two-story townhouse with brown trim. The residence does not display a number, but the parking space directly in front of the residence has the number "XXXX" displayed on the curb. The townhouse to the left of XXXXX displays the number "XXXXX" and the townhouse to the right displays the number "XXXXX". It is the residence of Julie KNOBLOCK and John KNOBLOCK.

M. **XXXXX XXXXXXXXX Court, Germantown, Maryland**. This residence is further described as a grayish blue-sided single-family residence. This residence has white shutters and the number XXXXX displayed above the white front entry door. It is the residence of Anthony GRANT.

N. **XXXX XXXXXX Street, Takoma Park, Maryland**. This residence is further described as a tan brick sided single-family residence with a white carport. The residence has the number "XXXX" displayed on a placard to the right of the front entry door. The residence has a light colored awning over the front door and is the residence of Jerome MAPLES.

O. **XXXX X Street, S.E., #103, Washington, DC**. This is further described as apartment #103 located on the first floor of a brick multi-XXXX Xpartment building number "XXXX", located at the intersection of X Street and 27th Street in South East, Washington, DC. The apartment building is marked on the X Street side with a blue awning over the entry doors. The blue awning is marked with the number "XXXX." It is the residence of Jerrod CLANTON.

P. **XXXX XXXXXX Street, N.E., Washington, DC**. This residence is further described a white colored single family residence number "XXXX" located on XXXXXX Street, N.E. in Washington, DC. This residence has the number XXXX displayed on an oval placard to the right of the front entry door. It is the residence of Kenneth MINOR.

3. **Seizure Warrants** are sought for the following vehicles:

A. **2003 Toyota Corolla** (VIN# XXXXXXXXXXXXXXXXX), bearing Maryland registration XXXXXXX. Currently registered to Keisha Shaunic JOHNSON at XXX XXXXXXXXXX Drive, XXXX X, Rockville, Maryland.

B. **2005 Chrysler 300-M** (VIN# XXXXXXXXXXXXXXXXX), bearing Maryland Registration XXXXXXX. Currently registered to Keith Eugene CAMPBELL at XXXXX XXXXX XXXXXXX Road, Dickerson, Maryland.

C. **2001 Toyota SeXuoia** (VIN# XXXXXXXXXXXXXXXXX), bearing Maryland registration XXXXXXX. Currently registered to Kevin Bernard Minor at XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland.

D. **2000 Land Rover** (VIN# XXXXXXXXXXXXXXXXX) bearing Maryland registration plate XXXXXXX. Currently registered to Keith Eugene CAMPBELL at XXXXX XXXXX XXXXXXX Road, Dickerson, Maryland.

## <u>Your Affiant</u>

4.     Your affiant, Special Agent Andrew P. Lawton, has been employed with the Drug Enforcement Administration since April of 2004 and states that I have been in law enforcement approximately ten (10) years. Currently, your affiant is assigned to the Washington Division Office, which includes responsibility for the Washington, DC and surrounding areas in Maryland and Virginia. Prior to that, I was a member of the Vermont State Police serving from 1997-2004 as a uniformed state trooper, as well as a narcotics detective for approximately 2 ½ years. I was a member of the West Virginia State Police serving from 1995-1997 as a uniformed state trooper. I personally have written and executed over 30 search and seizure warrants and have participated in the execution of numerous other search warrants during the course of other officer's investigations.

5.     Based upon your affiant's training, experience and participation in other investigations involving large amounts of cocaine, PCP, heroin and/or other controlled dangerous substances (CDS), your affiant knows:

a)     Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug

4

distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

b)      Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions.   Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.   To accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit, and safe deposit boxes.   All of these items are generally found in their within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends, and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

c)      It is common for individuals who deal in the sale of illegal controlled substances, to secrete contraband related to the trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing cocaine base, cocaine, PCP and other controlled substances for distribution within their residences, and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

d)      Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates.  These individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses.  These telephone records, bills and pager numbers are often found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

e)      Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband.   These photographs are usually maintained within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct

5

their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f)      Persons who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car receipts, records in fictitious names, false identification, money orders, cashiers checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking.

g)      Individuals involved in narcotics trafficking often own, possess and/or use weapons as a means of facilitating their illegal drug activities. Said firearms are used to protect and secure a drug trafficker's property and narcotics from law enforcement and from theft by other criminals. Such weapons are most often secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. These individuals also often possess ammunition and other items pertaining to the possession of firearms, including gun cases, ammunition magazines, holsters, spare parts for firearms, firearms cleaning equipment, photographs of firearms or of persons in possession of firearms, and receipts for the purchase and/or repair of all these items.

h)      Individuals who are members of active drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

6.     The information set forth below is based upon my personal observations or upon information provided to me by other law enforcement officers participating in this investigation.

**CASE SYNOPSIS**

7.     In August 2004, members of the Montgomery County Police Department Special Investigations Division (MCPD) and the United States Drug Enforcement Administration (DEA) initiated an investigation into a narcotics trafficking conspiracy functioning throughout Montgomery, Frederick, Prince George's, and Baltimore Counties in Maryland, and Washington, D.C.  The case began when the MCPD developed several confidential sources through controlled purchases of quantities of crack cocaine.  The development of the CSs initially led to several controlled purchases of quantities of crack cocaine and cocaine HCL from Keith Eugene CAMPBELL, a primary member of the conspiracy.  These controlled purchases were coordinated through the use of cellular telephones and led to the initiation of a court-authorized interception of wire communications occurring to and from CAMPBELL's telephone.

8.     On June 6, 2005, the interception order for CAMPBELL's telephone was signed by the Honorable Alexander Williams, Jr., United States District Judge for the District of Maryland.  From June 7, 2005 to July 8, 2005, wire communications occurring to and from CAMPBELL's telephone were monitored.  Based on the monitoring of these telephone communications, additional members of the narcotics trafficking conspiracy and their residences were identified.  The members of the conspiracy included both

CAMPBELL's sources of supply for cocaine (Troy GRAY), members of the conspiracy acting in partnership with CAMPBELL to obtain quantities of cocaine (Keisha JOHNSON and Jerrod CLANTON), and customers purchasing cocaine (Eric RING, Thomas CHATMON, Brandon HALL, and others). Over the thirty day period that the wire communications were monitored, CAMPBELL purchased for resale cocaine HCL, converted much of that cocaine HCL into cocaine base (crack), and distributed both cocaine HCL and crack to his customers. Of these customers, several purchased large quantities of cocaine (predominately crack). It is clear to your affiant, based on training, knowledge, experience, and the intercepted conversations, that these individuals purchased these quantities of cocaine for the purpose of further distribution. Surveillance teams observed numerous incidents where CAMPBELL either met with one of his sources of supply to obtain quantities of cocaine or met with his own drug customers.

9.     One of CAMPBELL's primary sources of supply for cocaine was Troy Otis GRAY. On July 8, 2005, Judge Williams signed an Order authorizing interception of communications over a telephone utilized by GRAY. Based on the monitored communications, and the surveillance conducted in relation to those monitored communications, Kevin Bernard MINOR was identified as GRAY's source of supply for cocaine.

10.     At the conclusion of the interception of GRAY's telephone, three additional interception orders were obtained from Judge Williams, in succession, for telephones that MINOR utilized to conduct his narcotics trafficking activities. From the interceptions occurring to and from MINOR's telephones, high level participants in the conspiracy and locations from which MINOR conducted his narcotics trafficking activities were

identified. One such high level participant in the conspiracy was identified as Darrin Antoine CHASE. An interception order was obtained from Judge Williams for wire communications occurring over CHASE's telephone. From these interceptions, it was established that CHASE is a kilogram level distributor of cocaine and a distributor of phencyclidine (PCP).

11.    On January 23, 2006, a federal grand jury for the District of Maryland returned an Indictment, which is sealed, charging **DARRIN ANTOINE CHASE, KEVIN BERNARD MINOR, KENNETH CORTEZ MINOR, KEITH EUGENE CAMPBELL, KEISHA SHAUNIC JOHNSON, TROY OTIS GRAY, JERROD DARNEL CLANTON, ERIC EDWARD RING, BRANDON O'NEIL HALL, and THOMAS ELMORE CHATMON** with one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base (crack) and 5 kilograms of cocaine HCL from June 2005 through January 1, 2006. Arrest warrants were issued but have not been served. The indictment included a forfeiture allegation, which states that the named defendants shall:

> …forfeit to the United States (1) any and all property obtained directly or indirectly as a result of any such violation, and (2) any and all property used, or intended to be used, in any manner or part to commit and to facilitate the commission of any such violation charged in this indictment, including the following:

> a.    $2 million in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate was furnished or intended to be furnished in exchange for controlled substances and constitutes proceeds traceable to such exchanges and was used or intended to be used to facilitate a violation of the Controlled Substances Act, in violation of Title 21, United States Code, Section 881(a) (6).

> a.    Personal property, including the following:

      i.      2003 Toyota Corolla, VIN # XXXXXXXXXXXXXXXX;
     ii.     2005 Chrysler 300-M, VIN # XXXXXXXXXXXXXXXX;
   iii.    2001 Toyota Sequoia, VIN # XXXXXXXXXXXXXXXX;
   iv.    2000 Land Rover, VIN # XXXXXXXXXXXXXXXX.

The indictment also names the following pieces of real property as substitute assets to be used to satisfy the forfeiture amount:

      i.    XXX XXXXXXXXXX Road, XXXX X, Rockville, Maryland[1];
     ii.   XXX XXXXXXX XXXXX, Frederick, Maryland;
   iii.  XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland;
   iv.   XXXX XXXXX Way, Brandywine, Maryland; and
    v.    XXX XXXXXXXXX Court, Frederick, Maryland

12.    Through the intercepted communications, your affiant learned the following, in addition to other information:

   A.   that one of the narcotics customers of both GRAY and CAMPBELL is Eric RING. GRAY generally supplies RING with quantities of cocaine which, based upon your affiant's training, knowledge and experience, were consistent with an intent to redistribute the drugs.

   B.   that Keisha Shaunic JOHNSON, CAMPBELL's paramour, engaged in a narcotics transaction with GRAY on behalf of CAMPBELL which included providing cash payments to GRAY for drugs.

   C.   that Jerrod CLANTON, who generally combined his funds with CAMPBELL to purchase large quantities of cocaine, engaged in narcotics transactions with GRAY.

   D.   that CAMPBELL sold quantities of controlled dangerous substances to several other individuals, including Jerome Wendell MAPLES, Brandon O'Neil HALL, Anthony Lopez GRANT, Julie and John KNOBLOCK.

   B.   that in addition to Keisha JOHNSON, CAMPBELL maintained a romantic relationship with Lolita Rochelle BURRESS. CAMPBELL maintains residences at both JOHNSON's home and BURRESS's home, as has been established by intercepted telephone communications and surveillance. CAMPBELL is known to frequent both locations throughout a given day. Intercepted conversations with both JOHNSON and BURRUSS revealed that both women spoke freely with CAMPBELL about his drug trafficking

---

[1] The indictment mistakenly identified this property as being located in Gaithersburg. It is actually in Rockville. This mistake will be corrected in a superseding indictment.

activities.  With some exceptions, CAMPBELL spent his days at JOHNSON's residence and his nights at the BURRESS residence.


**Search and Seizure Locations**

13.    **XXX XXXXXXXXXX Road, XXXX X in Rockville, Maryland**, the residence of Keith CAMPBELL and Keisha JOHNSON; a **2003 Toyota Corolla** (VIN # XXXXXXXXXXXXXXXXX), bearing Maryland registration XXXXXXX, registered to Keisha Shaunic JOHNSON at XXX XXXXXXXXXX Drive, XXXX X, Rockville, Maryland; a **2005 Chrysler 300-M** (VIN # XXXXXXXXXXXXXXXXX), bearing Maryland Registration XXXXXXX, registered to Keith Eugene CAMPBELL at XXXXX XXXXX XXXXXXX Road in Dickerson, Maryland; and a **2000 Land Rover** (VIN# XXXXXXXXXXXXXXXXX) bearing Maryland registration plate XXXXXXX, registered to Keith Eugene CAMPBELL at XXXXX XXXXX XXXXXXX Road, Dickerson, Maryland.

A.    Keith Eugene CAMPBELL is a male with a date of birth of October 13, 1969. In May 1998, he was arrested in Montgomery County, Maryland for possession of CDS paraphernalia; that charge was dismissed.  In March 1998, he was arrested in Montgomery County, Maryland, found guilty of CDS possession with intent to distribute and other drug-related charges, and sentenced on the PWID charge to ten years imprisonment.  In June 1993, CAMPBELL was arrested in Hagerstown, Maryland, found guilty of possession of CDS crack cocaine, and sentenced to four years imprisonment. In May, 1992, CAMPBELL was arrested in Montgomery County, Maryland for CDS possession with intent to distribute, found guilty and sentenced to one year and six months imprisonment.  He has other convictions not listed here.

B.    Keisha Shaunic JOHNSON is a female with a date of birth of October 17, 1974.   JOHNSON resides at XXX XXXXXXXXXX Drive, XXXX X, Rockville, Maryland per the Maryland Motor Vehicle Administration.  No criminal history was found.

C.  In the spring of 2004, investigators with the Montgomery County Police Department (MCPD) developed a confidential source (CS2) who entered into an agreement to cooperate with law enforcement after he/she was arrested for distribution of cocaine.  CS2 has provided law enforcement authorities with information found to be reliable.  On August 13, 2004, members of the MCPD and the Drug Enforcement Administration (DEA) utilized CS2 to make a controlled purchase of seven (7) grams of crack cocaine from Keith CAMPBELL at the Shell gas station at 1250 West Montgomery Avenue, Rockville, Maryland.  During this drug transaction, CAMPBELL utilized a red **2003 Toyota Corolla**, bearing Maryland registration XXXXXXX, which is registered to Keisha JOHNSON at XXX XXXXXXXXXX Road, XXXX X in Rockville Maryland.  Surveillance at the XXX XXXXXXXXXX address revealed that the Toyota was routinely parked at this location.  Also routinely parked at this location was a **2005 Chrysler 300M**, bearing Maryland Registration XXXXXXX registered to Keith CAMPBELL at 24 Applegrath Court, Germantown, Maryland.  A check of the Maryland wage records shows no record of lawful employment for CAMPBELL for 2003, 2004 and 2005 which would have provided a legitimate source of funds for CAMPBELL to purchase the **2005 Chrysler 300M** or the **2000 Land Rover**.  Based upon his training, knowledge, experience and the facts of this case, your affiant believes CAMPBELL used the proceeds of unlawful drug trafficking activities to purchase the vehicles.

D.  During September 2004, CS2 was used to make an additional controlled purchase of crack cocaine from CAMPBELL in Montgomery County, Maryland.  CAMPBELL sold the CS approximately thirty-one (31) grams of crack cocaine.

E.  In November 2004, members of the MCPD and the DEA developed another Confidential Source (CS3) who was acquainted with CAMPBELL.  CS3 has provided law enforcement authorities with information found to be reliable.  On November 8, 2004, CS3 made a controlled purchase of 34.1 grams of cocaine (HCL) and 24.5 grams of crack cocaine from Keith CAMPBELL in Montgomery County, Maryland.  Immediately prior to this transaction, CAMPBELL was observed by investigators leaving the residence at XXX XXXXXXXXXX Drive.  Minutes later, CAMPBELL arrived at the location where the transaction occurred.  The duration of time between CAMPBELL leaving the residence and arriving to complete the transaction indicated that CAMPBELL drove directly to meet with CS3.  On November 18, 2004, CS3 conducted another controlled purchase of crack (25.2 grams) and powder (31 grams) from CAMPBELL.

F.  On June 9, 2005, during the court-authorized interception of wire communications, CAMPBELL and GRAY discussed GRAY delivering "two" and picking up some "paper."  Based on training and experience, your affiant believes that GRAY agreed to deliver a quantity of cocaine to CAMPBELL

who would then give a sum of money to GRAY. CAMPBELL told GRAY the he was not home, but that GRAY could drop off the "two" at his house and get the money. CAMPBELL then called Keisha Shaunic JOHNSON at (XXX) XXX-XXXX, a telephone located at XXX XXXXXXXXXX Drive, XXXX X, Rockville, with service provided by Verizon in the name of S. Johnson. CAMPBELL explained to JOHNSON that Troy GRAY was coming to the residence and that he wanted JOHNSON to give GRAY "something." JOHNSON agreed. CAMPBELL directed JOHNSON to several different locations in the residence where money was located. CAMPBELL stated, "Ok. Look in the bag. There should be some loose, some loose money there. It's like $300, $290, don't give him that. Look inside the brown bag, it's a bunch of money in there rubber bands." CAMPBELL directed JOHNSON to another bag of money. He told JOHNSON that she could give GRAY the money in that bag, but not to give him the "stuff" that was in the bag with the money. JOHNSON told CAMPBELL that there were "1, 2, 3, 4, 5 stacks" of money in the bag and nothing else. CAMPBELL also directed JOHNSON to another stash of money in a "drawer" where he said there should be "stacks" of money. CAMPBELL told her to give GRAY one of the "stacks" out of the drawer. He explained that there should be "10 bills" in the stack. JOHNSON stated, "Ok, there should be 10. 1, 2, 3, 4, 5,… 10, ok." As JOHNSON was counting, paper rustling could be heard in the background. CAMPBELL told JOHNSON to call him when GRAY left.

G. During these intercepts, JOHNSON could be heard going to various locations within the residence and describing what she was finding. For example, at one point she said she had found "jerseys," which, based on your affiants training and experience was a reference to quantities of cocaine. CAMPBELL told her to give the money and not the "jerseys" to GRAY. Based on training and experience, your affiant believes that CAMPBELL was directing JOHNSON to collect money from locations within the XXXXXXXXXX residence to give to GRAY to complete a drug transaction. Later, CAMPBELL called GRAY and confirmed that GRAY obtained "65" from Keisha. Campbell also agreed, in guarded and coded language, to convert to crack the quantity of cocaine dropped off by GRAY. Later that night, CAMPBELL, using his cell phone, called JOHNSON, who was using the land line phone at the residence. CAMPBELL said the he was downstairs with the windows open and asked JOHNSON if she could "smell it." Based on training and experience and from these and other intercepted calls that day, your affiant believes that CAMPBELL was converting cocaine to crack, which can produce a distinct and strong odor, and was doing so within the residence of XXX XXXXXXXXXX Road, XXXX X.

H. On January 3, 2006, the Maryland Department of Assessment and Taxation records showed Keisha JOHNSON as the owner of the residence at XXX XXXXXXXXXX Road, XXXX X, Rockville, Maryland. On December 1, 2005, PEPCO records indicate that service for XXXA XXXXXXXXXX

Drive, Rockville, Maryland, is billed to Keisha JOHNSON at this address. As recently as December 8, 2005, at approximately 4:00 P.M., your affiant observed Keith CAMPBELL inside of his 2000 Land Rover, bearing Maryland registration XXXXXXX, directly in front of XXX XXXXXXXXXX Drive in Rockville, MD.  Based upon the physical surveillance conducted during the investigation and the wire intercepts, your affiant believes that CAMPBELL divides his time daily between this address (XXXXXXXXXX Road) and the residence of Lolita BURRUSS.

I.  Based on your affiant's training and experience and the information gained through this investigation, there is probable cause to believe the residence at **XXX XXXXXXXXXX Road, XXXX X,** is being utilized by Keith CAMPBELL and Keisha JOHNSON to further a drug distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

J.  Based on your affiant's training, knowledge and experience and the information gained through this investigation, there is probable cause to believe that the **2003 Toyota Corolla** (VIN # XXXXXXXXXXXXXXXXX), bearing Maryland registration XXXXXXX, registered to Keisha Shaunic JOHNSON the **2005 Chrysler 300-M** (VIN# XXXXXXXXXXXXXXXXX), bearing Maryland Registration XXXXXXX, registered to Keith Eugene CAMPBELL  and the **2000 Land Rover** (VIN# XXXXXXXXXXXXXXXX) bearing Maryland registration plate XXXXXXX, registered to Keith Eugene CAMPBELL, constitute substitute property pursuant to 21 U.S.C. § 853(p) for proceeds of the conspiracy charged in the Indictment, and therefore, should be forfeited to the United States of America.

14.  **XXXXX XXXXXXX XXXX Drive, Olney, Maryland,** the residence shared by

Lolita BURRUSS and Keith CAMPBELL:

A.  Lolita BURRUSS is a female with a date of birth of March 10, 1975. BURRESS resides at XXXXX XXXXXXX XXXX Drive, in Olney, Maryland.  BURRESS criminal history includes, but may not be limited to, a 1996 arrest for larceny and convicted in 1997 of felony larceny and misdemeanor larceny. No sentencing information was provided through NCIC.

B.  On June 9, 2005, CAMPBELL and BURRUSS were intercepted in a series of conversations.  BURRUSS was advising CAMPBELL that she wanted him to move in and live with her full time.  CAMPBELL advised her that he already stays with her every night.  In an additional conversation, BURRUSS advised

CAMPBELL where he could cook his crack if he moved in and discussed keeping the kids away while this occurred.

C. On June 28, 2005, CAMPBELL, using a monitored telephone, called (XXX) XXX-XXXX, which is subscribed to Lolita BURRUSS. CAMPBELL advised BURRUSS, "I got my phone swapped and then I went and met this boy to get, um… some t-shirts. This boy claimed that he wanted something. Pressed me like three days, now I spent all my fucking money to get this shit and he talking about how he gonna hold off. Maybe later in the week, some ole dumb ass shit." BURRUSS responded, "Well, why didn't he tell you? He knew you were going to get it today, right." CAMPBELL continued, "Yeah, I told him today because he say he want it yesterday, the day before, then I told him it would be tomorrow. I got it today and (inaudible). I didn't wash them right. But, um… I was getting ready to wash them. I called him, I said, man, yeah, you know what I am saying, a little while probably. He said, oh, I'm alright, yo, Baltimore bama, I'm alright yo, uh… uh…shit, I probably, I'm alright, I probably, I'll call you and let you know. I said what?" Based on training and experience, your affiant believes that CAMPBELL was complaining to BURRUSS that he had attempted to sell someone a quantity of cocaine, but the person did not have the money to make the purchase.

D. On July 2, 2005, MCPD established surveillance of XXXXX XXXXXXX XXXX Drive in Olney, Maryland. Through the interception of wire communications over (XXX) XXX-XXXX, this location was determined to be the residence of Lolita Rochelle BURRUSS. Keith Eugene CAMPBELL arrived at the location operating a red 2003 Toyota Corolla bearing Maryland registration XXXXXX. CAMPBELL parked his vehicle in the parking lot and went to the trunk of the vehicle. CAMPBELL opened the trunk and removed a white plastic bag containing an unknown object. CAMPBELL closed the trunk and walked into XXXXX XXXXXXX XXXX Drive.

E. On November 9, 2005, Nextel provided subscriber information on a second telephone number (XXX) XXX-XXXX, which is also listed to Lolita BURRUSS at **XXXXX XXXXXXX XXXX Drive, Olney, Maryland**. This phone, with IMSI # XXXXXXXXXXXXXXX, previously had been assigned to Keith CAMPBELL and was the first phone intercepted by wiretap in this investigation. At the time of the interception, this phone was assigned the number (XXX) XXX-XXXX. Your affiant believes that CAMPBELL provided BURRUSS with the telephone.

F. Surveillance during the course of this investigation, as well as conversation overheard during the wiretap on CAMPBELL's telephone line, has revealed that CAMPBELL divides his time on a daily basis between the residence of Keisha JOHNSON and the residence of Lolita BURRUSS and discusses his drug trafficking activities openly with each of them on the telephone. As recently as January 23, 2006, at approximately 7:00 AM, agents/officers

observed Keith CAMPBELL's 2000 Land Rover, bearing Maryland registration XXXXXXX, parked in front of the BURRUSS residence at XXXXX XXXXXXX XXXX Drive, Olney, Maryland.

G. Based on your affiant's training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXXXX XXXXXXX XXXX Drive contains documents relating to the drug trafficking activities of Keith CAMPBELL. Your affiant believes that documents relevant to this conspiracy will be located within the residence and requests a search warrant to look for documents further described on **Schedule B**.

15.    **XXX XXXXXXX XXXXX, Frederick, Maryland,** the residence of Troy

GRAY:

A. Troy Otis GRAY is a male with a date of birth of February 6, 1968. GRAY's address is XXX XXXXXXX XXXXX, Frederick, Maryland. GRAY has previous arrests, including a 1988 arrest for possession of controlled substances and a 1995 arrest for theft, but he has no prior convictions that have been located.

A. During the investigation, your affiant learned through surveillance and intercepted telephone conversations that GRAY and Keith CAMPBELL have engaged in an ongoing drug trafficking relationship. Conversations intercepted during the wiretaps on phones used by GRAY and CAMPBELL revealed a pattern of purchases of cocaine by CAMPBELL from GRAY, as well as pooling of money to make purchases from GRAY's supplier, Kevin MINOR. The phone used by GRAY throughout this investigation is subscribed to in CAMPBELL's name.

B. On June 20, 2005, Troy Otis GRAY called Keith Eugene CAMPBELL from telephone number (XXX) XXX-XXXX, subscribed to by Teresa GRAY at XXX XXXXXXX XXXXX in Frederick, Maryland. GRAY told CAMPBELL that he had misplaced his cellular telephone. CAMPBELL and GRAY discuss getting GRAY a new telephone. They also discussed how GRAY was going to contact his source of supply (later established to be Kevin MINOR). GRAY explained that he did not have MINOR's telephone number because it was in the cellular telephone that he misplaced. GRAY then told CAMPBELL that he was going to contact some other people in an attempt to get the telephone number for MINOR. In a later conversation GRAY told CAMPBELL that they were going to have to meet at the Nextel store at XXXXX XXXXX XXXXX Road, Rockville, MD XXXXX. This store is located in the XXXXXXXXXX shopping center and is across the street from CAMPBELL's residence.

16

C. Surveillance of the Nextel store was established. GRAY was observed meeting with CAMPBELL. During the meeting, GRAY was observed using CAMPBELL's telephone to contact MINOR. GRAY's conversation with MINOR was intercepted, GRAY advised MINOR that GRAY lost his telephone and was obtaining a replacement. MINOR advised GRAY that he had wanted to talk to him about replacing his telephone and advised that it was time for GRAY to get a new telephone. GRAY was overheard telling the Nextel employee that he desired to keep his telephone number. Once GRAY completed his business in the Nextel store, he and CAMPBELL left the store and got into the green Jeep.

D. Later on this date, CAMPBELL was contacted by MINOR. CAMPBELL asked, "Who's this?" MINOR stated, "Troy." CAMPBELL replied, "Ah, I'll call him and tell him to hit you." MINOR said, "O.k. Yeah give him this number here." Following this conversation, CAMPBELL began a series of conversations with GRAY. CAMPBELL advised GRAY that MINOR had contacted CAMPBELL in an effort to speak to GRAY. An inspection of the Pen Register on GRAY's telephone showed that GRAY contacted MINOR.

E. Later on this date, CAMPBELL received a telephone call from GRAY. GRAY asked CAMPBELL, "Yeah, everything o.k." CAMPBELL replied, "Yeah, yeah, you o.k., what did he say?" GRAY asked CAMPBELL where he wanted to meet. They made arrangements to meet, and then GRAY told CAMPBELL that GRAY was going to call MINOR. CAMPBELL told GRAY to call CAMPBELL back once GRAY spoke to MINOR.

F. A short time later, CAMPBELL and GRAY engaged in a series of conversations where GRAY advised CAMPBELL that he was about to meet with MINOR. GRAY and CAMPBELL made arrangements on where they would meet following GRAY's meeting with MINOR.

G. A short time later, CAMPBELL and GRAY were intercepted on CAMPBELL's telephone discussing the quantity of drugs they were going to obtain. CAMPBELL and GRAY were anticipating getting "three". CAMPBELL told GRAY that he would get "two" and a "half" and GRAY would get a "half". Based on training and experience and in the context of the prices and quantities discussed in these and other intercepted conversations, your affiant believes that "three" was a reference to three 1/4 kilogram quantities of cocaine (750 grams total), "two" was a reference to two 1/4 kilogram quantities of cocaine (500 grams total), and "half" was a reference to one 1/8 kilogram quantity of cocaine (125 grams total).

H. Inspection of the Pen Register on GRAY's telephone showed that after this call with CAMPBELL, GRAY had three contacts with MINOR. CAMPBELL then received a telephone call from GRAY. GRAY and CAMPBELL discussed the quantity of cocaine that GRAY obtained from MINOR, and

where GRAY and CAMPBELL were going to meet. GRAY counted the amount of cocaine that had obtained from his source of supply. GRAY counted "five." CAMPBELL became excited and told GRAY to give him all "five" and he would give GRAY "a half." GRAY told CAMPBELL to calm down because he was trying to count. GRAY then told CAMPBELL that he had received a "whole joint" (indicating he got a kilogram of cocaine). GRAY counted, "One, two, three, four, five, five, I got five." CAMPBELL told GRAY that he would take them all home with him. CAMPBELL explained that he would probably take three and a half and give GRAY one and a half. GRAY told CAMPBELL to bring him the money for "two". They then agreed to meet at Sakura's Restaurant. Surveillance was established on GRAY at this location. While conducting surveillance of GRAY's vehicle CAMPBELL was observed entering the parking lot driving a dark GRAY Honda Accord, bearing Maryland registration XXXXXX. CAMPBELL parked in the parking space beside GRAY's Jeep. CAMPBELL was observed opening the rear passenger door of the Jeep. CAMPBELL reached in the Jeep, appearing to reach under the seat. CAMPBELL removed a yellow bag and got into his vehicle. CAMPBELL then left the area. Surveillance was terminated at this time.

I.  A telephone call from CAMPBELL to GRAY was intercepted while CAMPBELL was observed retrieving the package from GRAY's vehicle. CAMPBELL stated, "Man, there ain't no sack in there man." GRAY replied, "What?" CAMPBELL stated, "There ain't no knapsack in there man." GRAY stated, "It's there, I mean my seat …" CAMPBELL advised, "Yeah, the back, the back, the back passenger joint." GRAY replied, "Yeah." CAMPBELL stated, "No, ain't no sack in there." GRAY told CAMPBELL that he would be right "out". CAMPBELL stopped GRAY. CAMPBELL stated, "No, no, no, I'm sorry, I got it, I'm gone." CAMPBELL then laughed and stated "later".

J.  Another example of a transaction involving GRAY, CAMPBELL and MINOR occurred on July 21, 2005. CAMPBELL and GRAY engaged in a series of conversations beginning at 1:25 p.m. in which CAMPBELL told GRAY that he had pooled his money with Jerrod Darnel CLANTON to purchase his portion of the cocaine. They further discussed that GRAY would have CAMPBELL convert all of his cocaine into cocaine base. Later that day, CAMPBELL and GRAY spoke again. CAMPBELL informed GRAY that CLANTON was complaining that the weight of the cocaine that MINOR had sold to them was only 985 grams.

K.  The wire interceptions of MINOR's telephone during the fall of 2005 revealed that GRAY's drug trafficking activities continued. For example, on November 22-23, 2005, a series of telephone contacts between MINOR and GRAY led to a meeting between the two. In initiating the contact on November 22, 2005, GRAY sent a digital message to MINOR's cell phone

using the code "0250." Based on training and experience, combined with the patterns observed during other calls, your affiant believes this code represents a request for 250 grams of cocaine.   In response, MINOR called GRAY and said that he received the message and will call back with the time for a meeting.   MINOR then told GRAY that he would be ready to complete the transaction the next day.

L.   The next day, November 23, 2005, at approximately 2:46 pm, MINOR told GRAY that he was attempting to contact the person who was "sitting on" the cocaine for him, but was having trouble reaching that person.   Within a minute and a half, MINOR twice attempted, without success, to contact the phone believed to be used by Tracy VENISON.   The pen register on another of MINOR's phones, shows a third attempt by MINOR to reach VENISON's phone.   This attempt appears to have been successful because the pen register data reflects that the call lasted approximately 1 minute and six seconds.   At approximately 3:19 pm, MINOR received a voice mail message from a female believed to be Tracy VENISON, who stated, "I am leaving my job now.   Call me back."   At approximately 3:32 pm, MINOR called GRAY and said that the person would be home by 4:30 pm.   At approximately 4:36 pm, MINOR directed GRAY to meet him at the Mobil gas station on Route 355 in ten minutes.   Cell site data pertaining to this call from MINOR at 4:36 pm indicates that he was in the area of VENISON's residence when he placed this call to GRAY.   At approximately 4:52 pm, surveillance agents observed MINOR and GRAY at the Mobil gas station on Route 355 in Germantown, Maryland.   Agents observed MINOR hand a red gift bag to GRAY, which, based on the intercepted calls, your affiant believes contained 250 grams of cocaine.

M.   On December 13, 2005, at approximately 6:01 P.M., agents/officers observed GRAY at XXX XXXXXXX XXXXX.   GRAY was observed working in the engine compartment of his Jeep Cherokee, bearing Maryland Registration XXXXXXX. On December 14, 2005, at approximately 3:45 A.M., an agent observed GRAY's Jeep Cherokee and a Ford Expedition, bearing Maryland Registration XXXXXXX, parked in the assigned parking spaces for XXX XXXXXXX XXXXX.   GRAY was observed driving both of these vehicles at various times during this investigation.   The Jeep is registered to GRAY's wife at XXX XXXXXXX XXXXX. The Expedition is registered to GRAY, at XXXXX XXXXXXXXX Way, Germantown, Maryland, and his wife, at XXX XXXXXXX XXXXX.[2]   The agent also observed a Honda Accord, bearing Maryland registration XXXXXX, parked in the rear of the residence. This Honda is registered in the name of Keith CAMPBELL, but frequently has been observed being operated by Troy GRAY.

---

[2]  During an intercepted conversation, GRAY indicated that xxxxx xxxxxxxxx Way was his previous address.

N. On January 9, 2006 and January 10, 2006, at approximately 5:20 a.m., departing his residence with a lunch type bag. This is consistent with observations and interceptions that indicate that GRAY leaves around this time of the morning when going to work at Verizon.

O. Based on your affiant's training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXX Ellison is being utilized by Troy GRAY to further a drug distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

16.    **XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland,** the residence of Kevin MINOR**;** and a **2001 Toyota SeXuoia,** bearing Maryland Registration XXXXXXX, (VIN # XXXXXXXXXXXXXXXXX), registered to Kevin MINOR at XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland**.**

A. Kevin Bernard MINOR is a male with a date of birth of August 19, 1959. MINOR's address is XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland.  On January 3, 2006, a check of the Maryland Department of Assessment and Taxation indicated that Kevin B. Minor is an owner of XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland.  Maryland MVA records reveal that MINOR provided XXXX XXXXXXX XXXX Court as his home address.

B. MINOR's criminal history includes a 1988 conviction in Washington, D.C. for distribution of controlled substances, for which he received a sentence of 121 months imprisonment; and a 1980 conviction in Washington, D.C. for violation of the Uniformed Narcotic Act (sale of heroin), for which he received a sentence of 9 months probation.

C. During the interception of wire communications throughout this investigation, agents continued to intercept telephone calls believed by your affiant, based upon training and experience, to pertain to ongoing drug trafficking activities of MINOR.

D. For example, in an intercepted call on June 25, 2005, GRAY told CAMPBELL that he was about to get off work and that MINOR was waiting for him.  Following this conversation, agents conducted surveillance at MINOR'S residence at XXXX XXXXXXX XXXX Court, Gaithersburg,

Maryland. At this time MINOR was observed getting out of a Brink's Home Security truck that was driven by GRAY. MINOR was carrying a briefcase. MINOR got into a 2001 Toyota Sequoia, bearing Maryland registration XXXXXXX, which was parked in front of MINOR's residence. This Toyota Sequoia is registered to Kevin MINOR at XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland. Both GRAY and MINOR then drove away from the residence. Agents followed GRAY, who drove directly to a meeting with CAMPBELL on XXXXX Avenue off of XXXXX XXXXX Road. Based upon telephone conversations between GRAY and CAMPBELL relating to this meeting, and your affiant's training and experience, your affiant believes that GRAY obtained narcotics from MINOR and then, in turn, distributed them to CAMPBELL.

E. Another meeting between GRAY and MINOR to engage in a narcotics transaction occurred on July 13, 2005. Surveillance team members watching MINOR as he waited for GRAY observed that MINOR stood on the passenger side of his Toyota Sequoia with the rear passenger door open. MINOR was observed leaning inside the vehicle, and manipulating something while being careful to stand so that his back would be to passersby and what he was manipulating inside the vehicle would be hidden from sight. MINOR stepped back from the door, closed the door and then walked to driver side of the vehicle. He was there for several seconds. He then returned to the rear passenger door and opened the door. Once again MINOR turned his back to passersby and began manipulating something inside the vehicle. MINOR then stepped back from the open door and, appearing to be looking for someone, looked to the front of his vehicle. When MINOR did this he held what appeared to be a soft white rectangular object in his left hand. The object was approximately six inches long and four inches wide. It was soft, pliable and smooth. MINOR looked down at the object in his hand and then placed it in the left front pants pocket of his shorts. Subsequently, GRAY and MINOR met. GRAY handed MINOR a plastic grocery bag. MINOR took the grocery bag and look inside the bag for several seconds. MINOR then moved to the rear passenger door of his vehicle, which remained open during the meeting. MINOR appeared to place the grocery bag in the vehicle and then returned to GRAY. MINOR then handed GRAY something and GRAY left. During an intercepted conversation between GRAY and CAMPBELL later that day, they discussed the coloring of the cocaine GRAY has been obtaining from MINOR and the color of the cocaine GRAY had just received from MINOR.

F. Further interceptions of wire communications on telephone lines used by MINOR during the Fall of 2005 confirmed that MINOR's drug trafficking activities are ongoing. For example, on November 19, 2005, MINOR contacted GRAY on an intercepted line to discuss the search of the residence of Eric RING the previous day by the Frederick Police Department. A few days later on November 22, 2005, GRAY and MINOR engaged in a series of

contacts your affiant believes, based upon his training, knowledge and experience, culminated in a drug transaction on November 23, 2005.

G. Your affiant knows from surveillance, wire interceptions and a check of the GPS tracker installed on the Toyota Camry frequently driven by MINOR that MINOR regularly departs his residence before 7 a.m. The Camry is registered in the name of Bernisa Garnett Terrell Minor (who is believed to be MINOR's wife), at XXXX XXXXXXX XXXX Court, but agents regularly observe this car being driven by Kevin MINOR.

H. Based on your affiant's training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXXX XXXXXXX XXXX Court in Gaithersburg is being utilized by Kevin MINOR to further a drug distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

I. Based on your affiant's training, knowledge and experience and the information gained through this investigation, there is probable cause to believe that the **2001 Toyota Sequoia** (VIN# XXXXXXXXXXXXXXXXX), bearing Maryland registration XXXXXXX, currently registered to Kevin Bernard Minor at XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland is either property used on committing a crime or property purchased with funds derived from unlawful drug trafficking and, as such are subject to seizure by law enforcement authorities.

17. **XXXX XXX XXXXXXXXX Avenue, XXXXX XXXXX, Hyattsville,**

**Maryland,** a business operated by Kevin MINOR**, and XXXX XXXXXXXXXX**

**XXXXXX, Baltimore, Maryland,** the residence of Ryan OWINGS:

A. Ryan OWINGS is a male with a date of birth of XXXXXXXX XX, XXXX. He has no prior criminal record.

B. On January 3, 2006, Maryland Department of Assessments and Taxation reports indicate that OWINGS is the current owner of XXXX XXXXXXXXXX XXXXXX, Baltimore, Maryland. On January 3, 2006, a check of the Maryland Department of Assessment and Taxation indicated that the listed Principal Agent and Principal Officer for Rockefeller Services Corporation, Inc., is Kevin B. MINOR. XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland is listed as both the agent's address and office address. This check also revealed a copy of the Articles of Incorporation for

XXXXXXXXXXX XXXXXXX XXXXXXXXXXX, XXX. dated 01-15-03. This document listed Kevin B. MINOR as the director of this corporation and lists an address of XXXX XXXXXXX XXXX Court in Gaithersburg, Maryland.

C.  In a lease agreement covering the time period of, 10/01/05 thru 09/30/08, Kevin MINOR leased XXXXX XXXXX at XXXX XXX XXXXXXXXX Avenue for "XXXXXXXXXXX XXXXXXXXXXX XXXX" The landlord for this property provided a copy of "Articles of Incorporation" for "XXXXXXXXXXX XXXXXXXXXX, XXX... a corporation under the general laws of the State of Maryland." This document lists Kevin B. MINOR as the Resident Agent with an address of XXXX XXXXXXX XXXX Court, Gaithersburg, Maryland. Records of the Maryland Department of Assessments and Taxation do not reveal such a company with MINOR as the Resident Agent. Prior to leasing XXXXX XXXXX, MINOR leased Suite # 302 in the same building for the period 9/15/03 through 09/30/05. MCPD and DEA have observed MINOR on numerous occasions throughout this investigation in the parking lots and hallways of XXXX XXX XXXXXXXXX Avenue.

D.  On November 12, 2005, a telephone call was intercepted between Kevin MINOR and a male later identified as Ryan OWINGS. Based upon your affiant's training, knowledge and experience, your affiant believes that the purpose of this call was to set up a drug transaction. During this conversation, OWINGS advised MINOR, "I just want to give this dude his change so he fucking chill out, you know what I mean," and MINOR responded, "Ok, so just want to head down after the four o'clock game?" OWINGS advised "Yea, I mean I'm ready whatever. What I'll probably do is like if I have to make three trips, I will. I'll probably just grab the change from you, go give it to him, and then if you need me to do what you said, then I will just come back." MINOR responded, "Ok, that's cool."

E.  During a series of calls intercepted the following day, November 13, 2005, MINOR and OWINGS agreed to meet at MINOR's office. Law enforcement located MINOR at the Wendy's restaurant on XXX XXXXXXXXX, Avenue in Takoma Park, Maryland, just north of MINOR's XXXX XXX XXXXXXXXX Avenue office. At this time, MINOR was operating the Camry, bearing Maryland Registration XXXXXX, and met with a male, later identified as Ryan OWINGS, who was operating a red Toyota Corolla, bearing Maryland Registration XXXXXX. MINOR and OWINGS were together for several minutes and then they separated. MINOR then went to his office at XXXX XXX XXXXXXXXX Avenue. Surveillance agents were not able to follow MINOR into the building because it was locked after hours. Both MINOR and OWINGS returned to the Wendy's and met for a second time and, after a short period of time, they separated.

F. OWINGS was followed from the meeting location and made no stops. Troopers with the Maryland State Police initiated a traffic stop on OWINGS on I-95 in Elkridge, Maryland. OWINGS produced a driver's license which listed his address as XXXX XXXXXXXXXX XXXXXX, Baltimore, Maryland, and said that his home phone number was (XXX) XXX-XXXX and his cell phone number was of (XXX) XXX-XXXX. OWINGS consented to a search of his vehicle, and a K-9 gave a positive response for the presence of drugs near the center console and the driver's seat. OWINGS was in possession of a Nike backpack, which he said contained $66,000 from a real estate deal. The backpack was found to contain $65,840. After scanning the backpack, the K-9 gave a positive alert for the presence of drugs. The back pack and money were seized, and OWINGS was permitted to leave. Officers on the scene detected a strong odor of cocaine emanating from the inside of the backpack.

G. Almost immediately after leaving the traffic stop, OWINGS left a message on Kevin MINOR's voice mail, saying "Call me back, man. It's an emergency." Subsequent forensic testing on the backpack seized from OWINGS indicated a positive result for the presence of cocaine.

H. Based upon the intercepted phone calls and surveillance, your affiant believes, based upon training, knowledge and expertise, that the office suite is being utilized as a "stash house" by Kevin MINOR and, further, that MINOR and OWINGS engaged in a drug transaction involving the exchange of the $65,840 in cash recovered from OWINGS.

I. Based on your affiants training and experience, there is probable cause to believe that the business at **XXXX XXX XXXXXXXXX Avenue, XXXXX XXXXX** is being utilized by Kevin MINOR to further a Cocaine Distribution Conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the business premises.

J. Based on your affiant's training and experience there is probable cause to believe that residence at **XXXX XXXXXXXXXX XXXXXX** is being utilized by Ryan OWINGS to further a Cocaine Distribution Conspiracy. Your affiant reXuests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

18.    **XXXXX XXXXXXXX Road, Gaithersburg, Maryland,** the residence of Tracy

VENISON:

   A. Tracy VENISON is a female with a date of birth of February 2, 1966. VENISON has the following criminal convictions from February 11, 1989: CDS- unlawful possession, CDS-paraphernalia use with the intent to use, and possession of a deadly weapon-concealed. VENISON was sentenced to 179 days, suspended, followed by one year of probation and a fine. Public records list the "buyers" of this XXXXXXXX Road address as Tracy M.VENISON and Gloria Venison.

   B. On November 16, 2005, a series of calls was intercepted between GRAY, MINOR, and a female, believed to be Tracy VENISON, who utilized a cell phone listed in the name of Alexi VENISON, dob XXXXXX. Tracy VENISON's dob is XXXXXX. (Public databases reveal an Alexi Venison, at XXXXX XXXXXXXX Road, with a social security number issued in 1997-1998, suggesting that Alexi Venison is a minor.) At 6:46 p.m., GRAY asked MINOR, "You up?" and MINOR responded, "Yea, I'm up. I got to, um, pick it up for you. You said you would be up around 9." At 7:08 p.m., MINOR then called the female (VENISON) and asked where she was located. The female (VENISON) responded that she was out, but would be home by 8:30. At approximately 9:00 p.m., law enforcement authorities observed the Toyota Camry regularly driven by MINOR parked on the street at VENISON'S address, XXXXX XXXXXXXX Road, Gaithersburg, Maryland. At approximately 9:07 p.m., MINOR and GRAY engaged in a series of calls during which MINOR gave directions to GRAY for a planned meeting. During this time, MINOR was observed walking to his vehicle from the rear of VENISON'S residence. MINOR was carrying an object about the size of a small football, which he placed in his trunk prior to departing the area. A subsequent call between MINOR and GRAY indicate that they completed the suspected drug transaction at an unknown location.

   C. As set forth in more detail in paragraphs 15 (L-M) above, on November 22-23, 2005, MINOR and GRAY engage in a series of conversations which culminated in a drug transaction. During the conversation, MINOR stated that he had someone "sitting on" a quantity of cocaine and that he had to make calls to that person in order to retrieve the cocaine. MINOR then made numerous calls to the phone believed to be used by Tracy VENISON. During these calls, MINOR arranged to meet with the subject believed to be VENISON at her residence to obtain a quantity of cocaine.

   D. Based upon your affiant's training, knowledge and experience, your affiant believes the intercepted phone calls and observations indicate that the VENISON residence is being utilized as a "stash house" for narcotics by Kevin MINOR.

E. Based on your affiants training and experience there is probable cause to believe that residence at **XXXXX XXXXXXXX Road** is being utilized by **Tracy VENISON** and **Kevin MINOR** to further a cocaine distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

19. **XXXX XXXXX Way, Brandywine, Maryland,** the residence of Darrin CHASE:

A. Darrin Antoine CHASE is a male with a date of birth of XXXXXXXXX XX, XXXX. CHASE's address is XXXX XXXXX Way, Brandywine, Maryland. CHASE's criminal history includes, 1) a 1987 arrest for possession with intent to distribute cocaine, for which he received 3 years, a portion of which was suspended: 2) a June 9, 1989 federal conviction, in the District of Columbia, for distribution of PCP, for which he was sentenced to 120 months imprisonment; and 3) a May 26, 1989 federal conviction, in the District of Columbia, for distribution of PCP, for which he was sentenced to 121 months imprisonment. (Note: While entered separately in NCIC, the last two entries may be for the same offense.)

B. During the course of the investigation, your affiant has learned through intercepted telephone calls and surveillance that CHASE was supplying MINOR and others with controlled substances. For example, on November 10, 2005, a series of calls was intercepted between Kevin MINOR and a male later identified as Darrin CHASE. During these conversations, MINOR stated, "… taking all day to answer me, when I call you, it's about money." CHASE answered, "Short, just say what you got to say and stop arguing with me." MINOR responded, "Ah, I can grab some help, they, they want to, they want to give me a time frame, they talking about, uh, have the have the stuff under, under the, um, under the bed," and CHASE answered, "Short, I can, I wish I could but I'm all in. Where you at? I need to talk to you in person." In the second call, MINOR advised CHASE, "Just bring me anything, Shorty, and I, I'll go from there." Based upon your affiant's training, knowledge and expertise, your affiant believes that MINOR and CHASE were discussing a drug transaction.

C. On November 17, 2005, CHASE engaged in another series of intercepted communications with an unidentified male ("UM"). During these conversations, the UM told CHASE that the "joint" he had was gone because "Lisa" thought he had "smoked that shit" so she "threw it in the woods across the street." The UM said, "I need you to bring me one, so I can give this man this joint, so I can have somebody working for me again… So, I need one." CHASE responded that he could not do the deal that night, but could do it the

next morning. Based upon training, knowledge and expertise, your affiant believes that the unidentified male asked CHASE to supply him with a quantity of drugs.

D. Based on your affiants training and experience there is probable cause to believe that the residence at XXXX XXXXX Way is being utilized by Darrin CHASE to further a cocaine distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

20. **XXXX XXXXXXXX XXXXX Drive, Unit XX, in Silver Spring, Maryland,**

the residence of Akita LEE:

A. Akita LEE is a female with a date of birth of XXXXXXXX XX, XXXX. Akita LEE's address is XXXX XXXXXXXX XXXXX Drive, Unit XX, Silver Spring, Maryland, which is in the XXXXXXXXXX Apartments complex. LEE has no known arrests.

B. During the investigation, your affiant learned through surveillance and intercepted phone calls that Darrin LEE as a "stash house" and to conduct narcotics transactions. Leasing records for XXXX XXXXXXXX XXXXX, Unit XX, indicate that the renter is Akita R. LEE. Documents obtained from the property manager for XXXX XXXXXXXX XXXXX Drive indicate that CHASE is listed as the "father" on the birth certificate for one of LEE's children. Intercepted phone conversations with CHASE, as well as GPS tracker information, indicate that CHASE regularly met narcotics customers at LEE's residence.

C. As an example of one such transaction, on November 28, 2005, a series of conversations was intercepted between Darrin CHASE and Kevin MINOR. MINOR advised, "AIN'T TOO MUCH, I AM JUST GOING ON. I GOT A DENTAL APPOINTMENT AT 12, I WILL BE OUT OF THERE AT 12. I AM TRYING TO SEE WHAT TIME I CAN HOOK UP WITH YOU, IF I CAN," and CHASE responded, "ALRIGHT, SURE, MAKE THAT PHONE CALL FOR ME." MINOR asked, "DO WHAT NOW," and CHASE replied, "CALL YOUR BROTHER FOR ME."

D. On this date, at approximately 12:42 P.M. MINOR advised, "YEAH, YOU NEVER CALLED ME BACK AND GAVE ME THE NEW NUMBER, BUT ON TOP OF THAT I WAS HEADING OUT. YOU GOING TO BE AROUND?" CHASE responded, "I AM IN SILVER SPRING AND THAT IS WHERE I AM GOING TO BE. I AIN'T GOING NO WHERE. I WILL TELL YOU WHEN YOU ARE HERE." MINOR advised, "I WILL BE

THERE, I WILL BE THERE IN ABOUT 25 MINUTES.  I AM GETTING READY TO GET ON 270."  At approximately 1:05 P.M., CHASE answered his phone, "YEAH," and MINOR responded, "OPEN UP." At approximately 1:06 P.M., a GPS tracker attached to the Toyota Camry, bearing Maryland registration 9BHR95 and regularly driven by Kevin MINOR, indicated that the vehicle was parked in the area of 1929 XXXXXXXX XXXXX Drive in Silver Spring, Maryland.   This vehicle remained at this location for approximately 20.3 minutes.

E.  On this date, at approximately 4:44 P.M., a conversation was intercepted during which Angless TYREE advised CHASE that he was "here" and CHASE advised that he was 20 minutes away.  At approximately 5:20 P.M., MCPD surveillance units arrived at XXXX XXXXXXXX XXXXX Drive and observed a Cadillac, bearing Maryland Registration XXXXXX, parked in the lot.  This vehicle is registered to Goldenia Richardson and Angless Darnell TYREE at XXXX XXXXX Place in Capital Heights, Maryland.   At approximately 5:31 pm, a male fitting the description of Angless TYREE was observed getting out of the passenger side of this vehicle and walking toward the building marked 1914/16. At approximately 5:33 pm, this same male was observed walking to this vehicle while talking on a cell phone.  Surveillance units were not able to see which apartment TYREE exited before entering his vehicle and leaving the area.

F.  On December 14, 2005, MCPD investigators met with the management of the XXXXXXXXXX Apartments which includes the address of XXXX XXXXXXXX XXXXX, Unit XX, in Silver Spring, Maryland.  The employee at this location identified Darrin CHASE from a photograph and advised that, on December 8, 2005, the employee observed CHASE entering XXXX XXXXXXXX XXXXX, Unit XX in Silver Spring, Maryland, using a key. The employee advised that CHASE was not observed operating a vehicle, but that a light colored Infinity truck was parked near that location during the time CHASE was present.

G.  A search through Maryland MVA records indicated that, on 09-28-05, Darrin CHASE had a 2004 Infinity Truck registered to him at XXXX XXXXXXXX Way, XXX. XXX, Clinton, Maryland.  This address is a UPS/Mailboxes Etc. business. CHASE is known to reside at XXXX XXXXX Way in Brandywine, Maryland.

H.  Further checks of the data recovered from the GPS tracker attached to the Camry driven by Kevin MINOR indicated that between October 12, 2005 and November 28, 2005, this vehicle was parked for time periods ranging from seven minutes to twenty minutes, at various times of the morning, afternoon and evening, in the area of XXXX XXXXXXXX XXXXX Drive on five separate occasions.  Agents discontinued use of the tracker on December 6, 2005.

I. Based on your affiants training and experience, the intercepted phone calls and observations your affiant believes that Darrin CHASE is utilizing the residence of Akita LEE at XXXX XXXXXXXX XXXXX Drive, Unit XX, as a "stash house" and a location to conduct narcotics transactions.

J. Based on your affiants training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXXX XXXXXXXX XXXXX Unit XX in Silver Spring, Maryland, is being utilized by Akita Lee and Darrin CHASE to further a drug distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

21. **XXX XXXXXXXXX Court, Frederick, Maryland,** the residence of Eric RING:

A. **Eric Edward RING** (a.k.a: Cyprus; Cypress) is a male with a date of birth of XXXXXX XX, XXXX. Public records show RING as the owner of the residence at XXX XXXXXXXXX Court, Frederick, Maryland, as of April 18, 2005. Ring's criminal history includes, but is not limited to a November 18, 2005 arrest for possession with the intent to distribute narcotics by the Frederick Police Department. Those charges are pending and RING is out on release.

B. On July 11, 2005, a call was intercepted between Troy GRAY and Eric RING, who utilized (XXX) XXX-XXXX, a cellular telephone listed to Eric RING at XXXXX XXXXX XXXXXX Drive, Germantown, Maryland. (This address appears to be RING's address before he purchased XXX XXXXXXXXX Court.) During this conversation, RING advised GRAY, "Um… I need an 'AI' like, you know, as soon as possible, man." GRAY responded, "Ok." Your affiant believes RING was asking GRAY for an "eight-ball" of cocaine, which is approximately 3.5 grams cocaine. In your affiant's training, knowledge and experience, AI is a common reference to an "eight-ball" of crack; AI are the initials for professional basketball player Allen Iverson, whose jersey number is 3.

C. On November 18, 2005, the Frederick Police Department executed a search warrant for contraband in an unrelated investigation at XXX XXXXXXXXX Court in Frederick, Maryland. Among the items recovered from residence were 2 firearms, approximately 3 "eight-balls" of cocaine, a small quantity of marijuana, scales, miscellaneous documents and packaging material. RING was arrested and charged with possession with intent to distribute cocaine; possession with intent to distribute marijuana; possession of cocaine; possession of marijuana; possession of CDS paraphernalia; and possession of a firearm while engaged in a drug trafficking crime. During the execution of

the search warrant at the residence, Troy Otis GRAY, RING's source of supply for cocaine HCL and crack cocaine, arrived at the residence. The vehicle GRAY brought to the scene was the dark grey Honda Accord, bearing Maryland registration plate XXXXXX, which is registered to Keith Eugene CAMPBELL.

D. On January 10, 2006, at approximately 5:58 a.m., RING was observed exiting his residence and leaving the area. He was followed as he drove to work at the gas station on Tuckerman Road and Seven Locks Road. This pattern is consistent with observations made during December 2005 and January 2006.

E. On January 13, 2006, a check of the pen register on Troy GRAY's phone indicates that, between November 18, 2005 and January 13, 2006, there were 151 contacts between GRAY and RING. From January 1, 2006 through January 13, 2006, GRAY and RING were in contact 31 times. Your affiant knows that this pattern of contact is consistent with contact between GRAY and RING throughout the drug distribution conspiracy and indicates that the search warrant executed in November 2005 did not disrupt the drug conspiracy.

F. Based on your affiant's training and experience, there is probable cause to believe that the residence at XXX XXXXXXXXX Court continues to be utilized by Eric RING to further a cocaine distribution conspiracy. Your affiant knows that narcotics traffickers often have long criminal records reflecting multiple arrests, yet they continue to sell narcotics. Your affiant requests a search warrant to look for the items described on **Schedule A** and believes that evidence, including documents, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

22. **XX XXXX XXXXXX Road, Gaithersburg, Maryland,** the residence of

Brandon O'Neil HALL:

A. **Brandon O'Neil Hall** is identified as a male with a date of birth of XXXXXXX X, XXXX. Surveillance conducted in December 2005 established that HALL resides at XX XXXX XXXXXX Road in Gaithersburg, Maryland. His criminal history is limited to a 2002 arrest for minor offenses, which were later dismissed. On January 3, 2005, another source of information (SOI), who had been arrested for possession of crack cocaine, advised that he/she had been purchasing crack cocaine from Brandon HALL at XX XXXX XXXXXX Road for 6-8 months. The SOI advised that that HALL lives at this address with his girlfriend and two children. Auto Track lists XX XXXX XXXXXX Road as an address for HALL in 2005. CAMPBELL has been observed at this residence beginning in October 2004. This sequence of events has been documented in paragraph 24(C), below, of

this affidavit.

B. On July 1, 2005, CAMPBELL engaged in a series of intercepted telephone calls with Brandon HALL, who was using a cellular telephone with the number (XXX) XXX-XXXX, subscribed to in Hall's name.  Based upon your affiant's training, knowledge and expertise, the conversations involved setting up a drug transaction during which CAMPBELL sold HALL "three joints" of cocaine base (crack cocaine).  In setting up the transaction, CAMPBELL stated, "I know you don't want that mother-fucker soft, do you?"  HALL replied, "Nah."  Based on training and experience, your affiant is aware that "soft" is a common expression for cocaine HCL and "hard" is a common reference to cocaine base.  CAMBPELL explained that he had to meet with his source of supply and that he anticipated that he would be able to meet HALL at approximately 8:00 p.m.  CAMPBELL stated, "Alright, and three joints.  I got you, man."  Based upon your affiant's training, knowledge and expertise, CAMPBELL was confirming the quantity of cocaine that HALL was to purchase.  HALL confirmed the quantity and the call ended.

C. At approximately 8:10 p.m., CAMPBELL called HALL and said, "Hey, I'll be there in about a half an hour, man, it wasn't ready, I'm finishing up now, so, I'll be there in about a half an hour, homeboy.  Hello? Hello? Hello? Hello? Hello? Hello?"  HALL replied, "Yeah, I'm, I'm, here."  CAMPBELL then said, "Yeah, I said I'll be there in about a half an hour because I'm, I'm finishing up now, 3 Reggies."  Your affiant knows that 3 Reggies would be 93 grams of cocaine, from this conversation it is unclear weather it was crack or HCL.

D. Later on July 1, 2005, law enforcement authorities established surveillance at XX XXXX XXXXXX Road, Gaithersburg, Maryland, in anticipation of the narcotics transaction between CAMPBELL and HALL.  At approximately 8:55 pm, CAMPBELL arrived at XX XXXX XXXXXX Road, parked his vehicle, and went into XX XXXX XXXXXX Road.  At approximately 9:07 pm, CAMPBELL was later observed exiting this residence and leaving the area.  Your affiant believes that CAMPBELL was meeting with HALL at the residence to complete a drug transaction they discussed by telephone.

E. Pen register data revealed a continued pattern of contact between CAMPBELL and HALL indicating an ongoing drug distribution conspiracy.  This investigation identified several phones used by HALL to contact CAMPBELL.  Between January 5, 2005 and November 30, 2005, the two most active phones utilized by HALL had a combined total of 876 contacts with phones used by CAMPBELL.  The last contact was on November 30, 2005.  (CAMPBELL stopped using this phone at around this time, and pen registers were not activated on subsequent phones used by CAMPBELL.)

F. Based on your affiants training and experience there is probable cause to believe that residence at XX XXXX XXXXXX Road is being utilized by

31

Brandon HALL to further a narcotics distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

23.    **XXXXX XXXXXXX Avenue, Poolesville, Maryland,** the residence of Julie

KNOBLOCK and John KNOBLOCK:

A.  Julie Marie KNOBLOCK is a female with a date of birth XXXXXXX XX, XXXX.  No criminal history was found for Julie KNOBLOCK.  John KNOBLOCK is a male with a date of birth XXXXX XX, XXXX.  John KNOBLOCK's criminal history includes, but may not be limited to, arrests for possession of CDS, violation of probation – CDS, distribution of phencyclidine, and conspiracy to distribute phencyclidine which did not result in convictions.  In addition, John KNOBLOCK was convicted in 1989 of possession of CDS - crack cocaine, for which he received a sentence of 2 years, all suspended, and followed by probation for 1 year and a fine.  In 1984, John KNOBLOCK was convicted of possession of cocaine and sentenced 2 years, all suspended, followed by probation for 1 year and a fine.

B.  During the investigation, your affiant learned through surveillance and intercepted telephone conversations that Julie and John KNOBLOCK engaged in an ongoing drug trafficking relationship with CAMPBELL.  Conversations intercepted over CAMPBELL's phone revealed a pattern of cocaine HCL and crack cocaine purchases by Julie and John KNOBLOCK.  The KNOBLOCK's were purchasing quantities of cocaine for both personal use and further distribution.

C.  An example of one such transaction occurred on June 18, 2005, when CAMPBELL received a call from John KNOBLOCK, using (XXX) XXX-XXXX, KNOBLOCK asked CAMPBELL how he was doing.  CAMPBELL replied, "My barrels a little empty motherf…"  John KNOBLOCK stated, "Right.  So you not working right?"  CAMPBELL advised, "Nah.  Hopefully later.  All I've got now is God Damn, about fucking,... balls, a ball of under, and shit."  John KNOBLOCK then asked CAMPBELL if he wanted to "get rid of it."  CAMPBELL told KNOBLOCK, "Hopefully, I can, hopefully I can make something happen.  But, uh, you know, when she get home, though, you can get this, you know?"  KNOBLOCK told CAMPBELL that he would probably get "that" and told CAMPBELL to call him later.

D.  CAMPBELL then received a telephone call from Julie KNOBLOCK, using (XXX) XXX-XXXX, Julie KNOBLOCK asked CAMPBELL if he heard from her husband (John KNOBLOCK).  CAMPBELL stated that he had.  CAMPBELL stated, "… he said he wanted to rock and roll.  I told him I was

dead, all I had was a ball, a ball of soft, that was it." Julie KNOBLOCK asked if that was all he had.   CAMPBELL stated, "I got a ball of soft."   Julie KNOBLOCK told CAMPBELL that she thought that CAMPBELL may have heard from her husband and that she would keep trying to call him.

E.   As another example of the conversations and observed actions of CAMPBELL, Julie KNOBLOCK and John KNOBLOCK, on July 01, 2005, Keith Eugene CAMPBELL received a call from John KNOBLOCK who ordered three 1/8 ounce quantities of crack cocaine, one 1/8 ounce quantity of cocaine HCL, and a "teeth" of cocaine HCL.  It is unknown what quantity the term "teeth" is indicating.  Later, CAMPBELL called John KNOBLOCK to confirm the order of three 1/8 ounce quantities of crack cocaine, one 1/8 ounce quantity of cocaine HCL, and a "teeth" of powder cocaine HCL. KNOBLOCK confirmed the quantities.

F.   CAMPBELL called John KNOBLOCK to set up the meeting and KNOBLOCK asked, "Where you going?"  Following this question a female voice, in the background of KNOBLOCK's telephone, was heard stating "Burger."  KNOBLOCK then said, "Burger?"  CAMPBELL agreed and told KNOBLOCK that he would be there in ten minutes.  KNOBLOCK stated, "She'll be there in fifteen."  The same female voice, believe to be that of Julie KNOBLOCK, is then heard saying, "Don't tell him that."

G.   Soon after, CAMPBELL called Julie KNOBLOCK, who told CAMPBELL that she was picking up "cash."   CAMPBELL complained that John KNOBLOCK told him that she had the money on hand and that she would meet him in fifteen minutes.  Julie KNOBLOCK asked CAMPBELL if he wanted to meet her at "Black Rock."  CAMPBELL said he did not know and would continue to drive her way.  Julie KNOBLOCK said, "Alright.  Just call me.  Call me.  I trying to get the money from him so let me…. I'll call you back in a minute."

H.   MCPD established surveillance of the area of Route 28 and quince Orchard Road, Darnestown, Maryland.  At this time, Keith Eugene CAMPBELL was observed operating a maroon Toyota Corolla, bearing Maryland registration XXXXXX.    During this time, Julie KNOBLOCK called CAMPBELL. CAMPBELL told KNOBLOCK that he was about to turn onto "Black Rock." KNOBLOCK told CAMPBELL that she was on her way and that she was doing "75 mph."  CAMPBELL told her not to get pulled over.  KNOBLOCK replied, "Fuck it.  My husband screws me every time, man.  From now on you tell him you wanna talk to me.   Then I know what the hell's up." KNOBLOCK continued talking and CAMPBELL interrupted stating, "Hey, hey, hey.  My phone might go out.  I'm turning on Black now.  I'm turning in now."  KNOBLOCK said, "Alright.  I'll be turning.  I see you turning.  I'll be there in about two minutes.  Bye."

I. When CAMPBELL stopped, he positioned his vehicle so that his driver's door was beside the driver's door of a brown van, bearing Maryland registration XXXXXXX.    The van was being driven by a female later identified as Julie KNOBLOCK.  The two vehicles remained side-by-side for approximately one minute.  When the two vehicles separated surveillance was terminated.    Maryland MVA records reveal that Maryland registration XXXXXXX is listed for a 1994 GMC truck to Julie Marie KNOBLOCK at XXXXX XXXXXXX Avenue, Poolesville, Maryland.

J. On December 14, 2005, MCPD established surveillance at XXXXX XXXXXXX Avenue in Poolesville, Maryland.    Julie KNOBLOCK was observed at this location exiting XXXXX XXXXXXX Avenue and entering a 1991 Chevrolet truck bearing Maryland registration XXXXXX and leaving the area.    This vehicle is registered to John and Julie KNOBLOCK at XXXXX XXXXXXX Avenue in Poolesville, Maryland.

K. Subscriber reports indicated that both the phone used by Julie KNOBLOCK, (XXX) XXX-XXXX, and the phone used by John KNOBLOCK, (XXX) XXX-XXXX, are subscribed to in the name of Sally Rebuck at XXXXX XXXXXXX Avenue, Poolesville, Maryland.    Auto Track records indicate that Julie Marie KNOBLOCK has used an alias of Julie Marie Rebuck. These records indicate that Sally Rebuck also was listed as a resident at XXXXX XXXXXXX Avenue, but her current address is listed in XXXX.    Based on these and other records, your affiant believes that Julie KNOBLOCK's maiden name was Julie Marie Rebuck and that Sally Rebuck is her mother.

L. Pen register data revealed a continued pattern of contact between CAMPBELL and John and Julie KNOBLOCK indicating an ongoing drug distribution conspiracy.  Between November 12, 2004 and October 15, 2005, the phone utilized by Julie KNOBLOCK had a combined total of 1407 contacts with phones used by CAMPBELL, with the last contact being on October 15, 2005.  Between November 12, 2004 and October 8, 2005, the phone utilized by John KNOBLOCK had a combined total of 1467 contacts with CAMPBELL's phones, with the last contact being on October 8, 2005.

M. Based on your affiants training and experience there is probable cause to believe that residence at XXXXX XXXXXXX Avenue is being utilized by Julie KNOBLOCK and John KNOBLOCK to further a cocaine distribution conspiracy. Your affiant reXuests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

24.    **XXXXX XXXXXXXXX Court, Germantown, Maryland,** the residence of

Anthony GRANT:

A. Anthony GRANT is a male with a date of birth XXXXXXXX XX, XXXX, who resides at XXXXX XXXXXXXXX Court, Germantown, Maryland. Grant's criminal history includes, but may not be limited to, a 1989 arrest in Montgomery County, Maryland for CDS possession, for which the judgment was stayed and a fine imposed.

B. During this investigation, your affiant has learned through surveillance and intercepted phone conversations that CAMPBELL and GRANT have engaged in an ongoing drug trafficking relationship.

C. As an example of this relationship, on October 13, 2004, MCPD established surveillance at CAMPBELL's residence at XXX XXXXXXXXXX Road, Rockville, Maryland. CAMPBELL was observed leaving this location and was followed to XX XXXX XXXXXX Road, Gaithersburg, Maryland, the residence of Brandon HALL.

D. A short time later, CAMPBELL was observed meeting with Anthony GRANT in the 700 Block of Quince Orchard Boulevard, Gaithersburg, Maryland. GRANT was operating a Chevy Tahoe, bearing Maryland registration XXXXXXX, which is registered to Anthony Lopez GRANT at XXXXX XXXXXXXXX Court, Germantown, Maryland. During this suspected drug transaction, GRANT walked up to the driver's window of CAMPBELL's vehicle and appeared to have a conversation with CAMPBELL. After about four (4) to five (5) minutes, CAMPBELL, while still at the driver's window, was observed handing GRANT a small square shaped object, the size of a small book or rectangular box. The object was wrapped in a blue t-shirt or cloth. During the exchange, GRANT was surveying the area in what appeared to be an attempt to see if his activities with CAMPBELL were being watched.

E. After receiving the book shaped object, GRANT walked back to the green Chevy Tahoe and placed the book shaped object inside through the front passenger door. GRANT then returned to CAMPBELL's vehicle and spoke with him for approximately three (3) to four (4) minutes. GRANT and CAMPBELL then left that area.

F. Another example of a transaction involving GRANT was observed on June 10, 2005. An exchange of telephone calls was intercepted between CAMPBELL and GRANT. This exchange of telephone calls was made between Anthony GRANT and CAMPBELL in an effort to arrange a transaction where GRANT would purchase a "table." The meet location was established as the Exxon gas station at Shady Grove Road and Crabbs Branch Parkway, Gaithersburg, Maryland. GRANT told CAMPBELL that he left because he saw several vehicles in the parking lot that he believed were the police. GRANT stated," I just pulled off, 'cause mug was looking. Shit was moving all everywhere out there." CAMPBELL replied, "Yeah, one pulled in

the gas station. One pulled in the gas station, right? I went down by the Giant, and one parked in the little cut way there." GRANT pointed out several vehicles that he felt were conducting surveillance of him. Following this, GRANT and CAMPBELL arrange another meeting later that day. GRANT asked CAMPBELL if he could bring double his original order by stating, "Cause, you may have to bring another one of those buddies with you. Can you do it?" CAMPBELL replied, "Shit, I ain't even got any. I mean I ain't got any with me. Know what I'm saying?" GRANT asked, "Yeah, can you get it?" CAMPBELL told GRANT that he can not get it before their next meeting. GRANT told CAMPBELL that was going to "hurt" him because he has already "popped one off." GRANT stated, "Get me on the next one." CAMPBELL replied, "Yeah. Alright. Drop that 5 up to Ty house then." On this date, surveillance by MCPD had observed CAMPBELL and GRANT attempt to meet at the Exxon gas station at Shady Grove Road and Crabbs Branch Parkway. During this meet, GRANT was observed operating a 2005 Dodge, bearing Maryland registration XXXXXXX, which is owned by Enterprise Leasing Company. Records of Enterprise Leasing Company reveal that this vehicle was leased on June 10, 2005 by Charleen GRANT with a listed address of XXXXX XXXXXXXXX Court, Germantown, Maryland. Anthony GRANT was listed as an additional driver on this lease agreement.

G. On December 3, 2005, Maryland Department of Assessments and Taxation records revealed that Anthony L. GRANT and C. Grant own the residence at XXXXX XXXXXXXXX Court in Germantown, Maryland.

H. On December 14, 2005, MCPD established surveillance at XXXXX XXXXXXXXX Court in Germantown, Maryland. At this time, a 1995 BMW, bearing Maryland registration XXXXXX, was parked in the driveway of this residence. As of December 14, 2005, this vehicle was registered to Anthony Lopez GRANT at XXXXX XXXXXXXXX Court in Germantown, Maryland.

I. On December 23, 2005, utility records obtained from Allegheny Energy indicated that Anthony GRANT is currently billed for the power service at XXXXX XXXXXXXXX Court in Germantown, Maryland.

J. Pen register data revealed a continued pattern of contact between CAMPBELL and GRANT indicating an ongoing drug distribution conspiracy. Between November 15, 2004 and November 2, 2005, the phone used by GRANT had 1406 contacts with phones used by CAMPBELL, with the last contact being on November 2, 2005.

K. Based on your affiants training and experience there is probable cause to believe that residence at XXXXX XXXXXXXXX Court is being utilized by Anthony GRANT to further a cocaine distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule B** and

believes that evidence, including documents, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

25.    **XXXX XXXXXX Street, Takoma Park, Maryland,** the residence of Jerome

MAPLES:

A.  Jerome MAPLES is a male with a date of birth of XXXX XX, XXXX, who lives at XXXX XXXXXX Street, Tacoma Park, Maryland. MAPLES criminal record, includes, but may not be limited to, 1) a 1990 conviction for possession of cocaine, for which he was sentenced to a period of confinement which appears to have been suspended; and 2) a 2001 conviction for possession of cocaine base in excess of five (5) grams and carrying a pistol without a license, for which he was sentenced to 87 months imprisonment, followed by two years of supervised release and a fine.  It appears that MAPLES is currently on supervised release.

B.  During this investigation, your affiant has learned through surveillance and intercepted phone conversations that CAMPBELL and MAPLES have engaged in an ongoing drug trafficking relationship.  CAMPBELL has been supplying MAPLES with distribution quantities of narcotics.

C.  As an example of one such transaction, on July 1, 2005, a series of calls were intercepted between CAMPBELL and Jerome Wendell MAPLES, during which MAPLES asked CAMPBELL what time they could meet.  CAMPBELL said they could meet around 7:00 p.m.

D.  At approximately 6:43 p.m., CAMPBELL called MAPLES and advised, "I ain't quite ready yet, but, ah…., you know, I wanted to know, ah, you know what.  The same as last time or you wanna, you know, double up or what?" MAPLES said, "No.  Just a Reggie."   CAMPBELL said that he wanted to confirm that.

E.  At approximately 8:51 p.m., CAMPBELL called MAPLES and arranged to meet at approximately 9:30 p.m. at a mall.  This information was relayed to the members of the surveillance team conducting observation of CAMBPELL.

F.  CAMPBELL and MAPLES then engaged in a series of conversations during which CAMPBELL agreed to supply MAPLES with cocaine.  CAMPBELL and MAPLES finally agreed to meet at the supermarket.  At approximately 9:57 p.m., CAMPBELL called MAPLES and asked MAPLES how far away from the meet location he was.   MAPLES said, "I'm in the joint." CAMPBELL said, "Oh yeah?"  MAPLES replied, "Yeah, I'm in the parking lot.  I think I'm next to your car.  You in the red joint?"  CAMPBELL stated,

"Yeah." MAPLES asked CAMPBELL if he wanted to conduct the transaction inside the supermarket. CAMPBELL told MAPLES to pull his vehicle in front of the supermarket, and said he would come out and get in the car.

G. At approximately 9:58 p.m., the surveillance agents observed CAMPBELL arrive at the Safeway in Hillandale, Silver Spring, Maryland, in the Toyota Corolla registered to Keisha Johnson, but regularly driven by CAMPBELL. CAMBPELL walked over to a small green Mazda, bearing Maryland registration XXXXXX. The registered owner of this vehicle is Jerome Wendell MAPLES at XXXX XXXXXX Street, Takoma Park, Maryland. The operator of the green Mazda was identified as Jerome Wendell MAPLES. CAMPBELL went inside the Safeway and soon after, returned to the parking lot and got into the front passenger seat of the green Mazda. MAPLES, still in the driver's seat, and CAMBPELL drove around the parking lot one time. CAMPBELL got out of the vehicle and got into the Toyota. Both CAMPBELL and MAPLES then left the area in their respective cars. Based on your affiants training and experience, these observations are consistent with a narcotics transaction.

H. On November 27, 2005, MCPD established surveillance at the XXXX XXXXXX Street address. At approximately 3:38 P.M. Jerome MAPLES was observed arriving at this location operating the Mazda bearing XXXXXX. MAPLES was observed approaching the front door of XXXX XXXXXX St. and waiting to be let inside the residence.

I. On January 3, 2006, agents Xueried Maryland MVA records and found that registration XXXXXX is currently listed to a 1993 Mazda 4 door sedan in the name of Jerome Wendell MAPLES at XXXX XXXXXX Street, Takoma Park, Maryland. Maryland MVA records also list XXXX XXXXXX Street in Takoma Park, Maryland as the address of record on MAPLES driver's license.

J. On January 4, 2006, MCPD surveillance observed MAPLES' 1993 Mazda, bearing XXXXXX, parked in front of XXXX XXXXXX Street, Takoma Park, Maryland.

K. Pen register data revealed a continued pattern of contact between CAMPBELL and MAPLES indicating an ongoing drug distribution conspiracy. Between January 29, 2005 and October 2, 2005, the two most active phones utilized by MAPLES had a combined total of 594 contacts with phones used by CAMPBELL, with the last contact being on October 2, 2005.

L. Based on your affiants training and experience and information gained through this investigation, there is probable cause to believe that residence at XXXX XXXXXX St. in Takoma Park is being utilized by Jerome MAPLES

to further a Cocaine Distribution Conspiracy and that documents relevant to this conspiracy will be located within the residence. Your affiant requests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

26.    **XXXX X Street, S.E., Apartment 103, Washington, D.C.,** the residence of

Jerrod Darnel CLANTON:

A.  **Jerrod Darnel CLANTON** is a male with a date of birth XXXXXX XX, XXXX. CLANTON resides at XXXX X Street, XXXXXXXXX XXX, Washington, D.C. Clanton's criminal history includes, but may not be limited to, the following arrests 1) January 1990 - possession with the intent to distribute cocaine, and UCSA – cocaine; 2) March 1990 – USCA – cocaine; 3) 1996 – possession with intent to distribute marijuana; 4) 1997 – possession with intent to distribute marijuana. Disposition for these offenses are unclear from the NCIC report. CLANTON's criminal record includes the following conviction in 1992 for possession with the intent to distribute cocaine, for which he was sentenced to 15 years in prison.

B.  During the investigation, your affiant has learned through surveillance and intercepted phone conversations that GRAY, CAMPBELL and CLANTON have engaged in an ongoing drug trafficking relationship. Conversations intercepted during the investigation revealed a pattern of purchases of cocaine by CLANTON from GRAY and CAMPBELL, as well as CLANTON pooling of monies with CAMPBELL to enable them to purchase larger quantities of drugs. The phone used by CLANTON throughout this investigation is subscribed to in CAMPBELL's name.

C.  On July 3, 2005, CAMPBELL and Jerrod CLANTON discussed CAMPBELL's supply of cocaine HCL and cocaine base (crack). CAMPBELL told CLANTON that he was selling quantities of crack quickly. CAMPBELL said, "I ain't even got any hard ball left." CLANTON replied, "Hold up, out of a Marino and a half you don't have no hard ball left, man?" CAMPBELL replied, "No, no, that was my last. That shit gone." CLANTON said, "No, no, no, what I'm saying you just seen the boy. The boy just brought you three yesterday." CAMPBELL stated, "I'm starting on them now mother-fucker. I ain't say I didn't have no more left. I said all my other shit is gone. That, I had a mother-fuckin' Nida and like a duce, that shit gone. I'm getting ready to start the Marino and a half now." CAMPBELL the stated, "I can't even, I ain't even got time to breath mother-fucker. I got to grab my folks out her mother's house. I told the boy I give you an underhand, man, if you want to do it at the Chevy's. He said ain't no problem with that. Alright, so that's cool with me." CLANTON said, "Why did you give him an

underhand when you got some brewed up already?" CAMPBELL replied, "No I don't, my shit brewed up is already gone." CLANTON found it hard to believe that CAMPBELL had gone through a "Marino and a half." CAMPBELL explained again the amount and form of cocaine that he sold and had on hand. CLANTON stated, "Listen to me without yelling. Let me just say one thing to you. You blew up my shit, and how many other, you blew up like three 125's yesterday, didn't you? Am I lying?" CAMPBELL said, "No, I didn't have to do nothing yesterday. I did something Friday." CLANTON continued, "Well, Friday I mean. You mean from the shit you got on Friday, you don't have no more underhand, no more overhand, no more overhand, no more underhand, none of it?" CAMPBELL stated, "None. That shit gone." CLANTON replied, "Mother-fucker you did like three fuckin' 125's. And all that shit is gone?" CAMPBELL said, "One 125 was yours." CLANTON said, "All, my fuckin' god, you did (unintelligible) in one day." CAMPBELL said, "One 125 was yours." CLANTON said, "All my fuckin' god, you did nine in one day." CAMPBELL again stated that one of the "125's" was CLANTON's. CLANTON continued to be express astonishment at the amount of cocaine that CAMPBELL had sold and how fast he sold it. CAMPBELL explained that he had to pay for the cocaine that he had just received. CAMPBELL stated that he had to give the source of supply "10 something." CLANTON told CAMPBELL that he should purchase a "Tweety" (referring to kilogram of cocaine) rather than continuing to purchase smaller amount's day after day. CAMPBELL explained that the quality would be less if he purchased a larger amount. CLANTON and CAMPBELL went on to discuss the fact that both of them have a good client base and are selling large amount's of cocaine. CLANTON stated, "I have never seen you crank so hard in my life like this man, never in my life, man. You got to admit you back, man."

D.  On July 28, 2005, a series of conversations was intercepted between Jerrod CLANTON and Troy GRAY. During these conversations, CLANTON and GRAY agreed to meet on the Clara Barton Parkway at the Chain Bridge in Montgomery County to purchase a quantity of cocaine. MCPD established surveillance at this location and, at approximately 7:51 pm, observed CLANTON meeting with GRAY. During this meeting, CLANTON was operating a black 1999 GMC Yukon, bearing Maryland registration 336MXX2, which is registered to Zorana Clanton at 7117 East Kilmer Street, Landover, Maryland. At approximately 1:00 pm, prior to the meeting between CLANTON and GRAY, this vehicle was observed parked in the area of XXXX X Street, Apartment 103, S.E, Washington, D.C.

E.  On December 1, 2005, Pepco provided utility records for XXXX X Street, S.E. Apartment 103, Washington, D.C. These records indicated that Jerrod D. CLANTON is billed for the electrical power at this address.

F.  On December 19, 2005, at approximately 5:20 A.M., surveillance was

established at XXXX X Street, XX, Washington, D.C.  At this time the black GMC Yukon, bearing Maryland registration 336MXX2, was observed in the rear of the building.  At approximately 5:59 A.M., surveillance observed Jerrod CLANTON exit the rear door to XXXX X Street and place a duffle bag into the back of the Yukon.  At approximately 6:00 A.M., CLANTON drove this vehicle out of the parking area.  Surveillance was terminated due to CLANTON's excessive speed and erratic driving.

G. Pen register data revealed a continued pattern of contact between CAMPBELL, GRAY and CLANTON indicating an ongoing drug distribution conspiracy. This investigation identified several phones used CLANTON to contact other members of the drug distribution network. Between November 11, 2004 and January 27, 2006, the two most active phones utilized by CLANTON had a combined total of 6926 contacts with phones used by GRAY and CAMPBELL, with the last contact being on January 27, 2006 with GRAY's phone.

H. Based on your affiants training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXXX X Street, XX, XXX. XXXXX, is being utilized by Jerrod D. CLANTON to further a drug distribution conspiracy and that documents relevant to this conspiracy will be located within the residence. Your affiant requests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

27. **XXXX XXXXXX Street, N.E., Washington, D.C.,** the residence of Kenneth MINOR:

A. **Kenneth Minor** is a male with a date of birth XXXXXXXXX XX, XXXX. Kenneth MINOR, the brother of Kevin MINOR, resides at XXXX XXXXXX Court, Washington, D.C.  Kenneth MINOR has prior arrests for the following offenses, dispositions for which are unknown:  1) 1982 - Uniform Controlled Substances Act - heroin;  2) 1984 - carrying a pistol without license, unregistered firearm, simple assault, 3) 1989 – burglary; 4) 1990 – murder one while armed; 5) 1992 – USCA – possession of cocaine; 6) 1993 - carrying a pistol without a license; and 7) 1996 - fugitive from justice.  These arrests did not result in convictions.  Kenneth MINOR also has the following convictions listed on his criminal record:  1)  1990 -  conviction for receiving stolen property, for which he received a sentence of 9 months, suspended, followed by 9 months of probation; and 2) 1990 - possession of cocaine, for which he was sentenced to  one year, suspended, followed by 2 years of probation and fine.

B. During this investigation, your affiant has learned through surveillance and intercepted phone conversations that Kenneth MINOR, Kevin MINOR and Troy GRAY have engaged in an ongoing drug trafficking relationship.

C. On July 29, 2005, a series of conversations was intercepted between Kevin MINOR and GRAY. During these conversations, GRAY and Kevin MINOR agreed to meet at the Sam's Club in Gaithersburg, Maryland. During one of these conversations GRAY advised MINOR, "O.k., alright that's cool. I should be there by the Sam's Clubs or something," and Kevin Minor responded, "Okie dokie… I should be there in the next XX minutes."

D. Approximately one and one-half hours later, a series conversations was intercepted between GRAY, Kenneth MINOR and Kevin MINOR. GRAY asked, "What's up, Shorty," to which Kenneth MINOR responded, "You talk to brother?" GRAY replied, "Yeah, I just left him." Kenneth MINOR responded, "He called you back? Where you at?" GRAY advised, "Sam's Club." Later, MINOR advised GRAY, "I'm about to come and get one of them (inaudible) off of you, man. You know what I'm saying? I'm going to try to come hang all the way up that joint." GRAY and Kenneth MINOR agreed to meet at the Montgomery Mall in Bethesda, Maryland. In a subsequent call with Kevin MINOR, GRAY asked, "I'm only giving him two?" Kevin MINOR replied, "You going to give him the duce."

E. Surveillance was established at the Montgomery Mall. At approximately 6:25 pm, GRAY, operating a grey Honda Accord, bearing Maryland registration XXXXXX, entered the parking lot of Montgomery Mall. This Honda is registered to Keith CAMPBELL but is regularly operated by GRAY. Surveillance observed that GRAY was on the telephone as he drove through the lot. GRAY parked his vehicle and went to the trunk. Surveillance saw that GRAY was manipulating something in a plastic yellow bag, approximately the size of a plastic grocery bag. GRAY soon left his vehicle and entered the mall.

F. Surveillance was maintained on GRAY while he was in the mall, and at approximately 6:49 pm, Kenneth MINOR and GRAY spoke by telephone and agreed to meet in front of Nordstrom's. At approximately, GRAY returned to his vehicle and drove to the entrance to Nordstrom's, where he pulled next to a silver Volvo and parked. At approximately 6:58 pm, surveillance observed Kenneth MINOR lean in the front passenger window of GRAY's vehicle. MINOR and GRAY appeared to engage in conversation. After approximately 1 to 2 minutes, MINOR stood up and moved toward the silver car parked next to GRAY's. In his right hand, MINOR held a white plastic grocery bag wrapped tightly around a cylindrical object. MINOR walked to the open driver window of his silver Volvo and placed the cylindrical object in the vehicle. MINOR then returned to the front passenger window of GRAY's vehicle and they continued talking. Soon after, Kenneth MINOR and GRAY

separated and drove away from the area. Kenneth MINOR's vehicle displayed DC registration XXXXXX, which is listed to a silver 2000 Volvo registered to Kenneth MINOR at XXXX XXXXXX Street, N.E., Washington, DC.

G. On November 30, 2005, surveillance was conducted of XXXX XXXXXX St., N.E, Washington, DC. Among the vehicles located in front of the residence were Kenneth MINOR's silver Volvo, bearing DC registration XXXXXX, and a silver Toyota Camry, bearing DC registration XXXXXX, also registered to Kenneth MINOR at this address.

H. On December 7, 2005, your affiant conducted surveillance of XXXX XXXXXX Street, N.E., Washington, D.C. On this date, Kenneth MINOR's silver Volvo and silver Toyota Camry were observed at this address.

I. Pen register data revealed a continued pattern of contact between Kenneth MINOR, Kevin MINOR and GRAY indicating an ongoing drug distribution conspiracy. This investigation identified several phones used by Kenneth MINOR to contact other members of the drug distribution network. Between June 30, 2005 and January 28, 2006, the three most active phones utilized by Kenneth MINOR had a combined total of 299 contacts with phones used by Kevin MINOR and GRAY. The last contact was on January 28, 2006 with a phone used by GRAY.

J. Based on your affiant's training and experience and the information gained through this investigation, there is probable cause to believe that residence at XXXX XXXXXX Street is being utilized by Kenneth MINOR to further a drug distribution conspiracy. Your affiant requests a search warrant to look for the items described on **Schedule B** and believes that evidence, including documents, contraband, fruits of crime, or property designed or intended for use or used in committing a crime, relevant to this conspiracy will be located within the residence.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief

_____
Andrew P. Lawton, Special Agent
Drug Enforcement Administration

Sworn to before me this 31st day of January, 2006

43

_____
WILLIAM CONNELLY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MARYLAND